**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

| | | |
|---|---|---|
| STATE OF MARYLAND, *et al.*, | * | |
| *Plaintiffs-Appellees*, | * | |
| v. | * | |
| | | No. 25-1248, 25-1338 |
| UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*, | * | |
| | * | |
| *Defendants-Appellants.* | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**APPELLEES' OPPOSITION TO
MOTION FOR STAY PENDING APPEAL**

Stays are intended to preserve the status quo and prevent disruption during the pendency of litigation.  Here, issuing a stay would do exactly the opposite—it would abruptly terminate the employment of thousands of public servants through no fault of their own.  And it would again plunge the Appellee States into chaos by straining their unemployment and public benefit systems and leaving them scrambling to comply with federal statutory mandates.  That harm contrasts sharply with the cost to the Appellant Agencies of abiding by the district court's carefully crafted injunction, which simply requires them to comply with federal notice requirements before engaging in mass terminations that directly harm the Appellee States.  The

equities of this case are straightforward. So is the law governing mass terminations. Neither law nor equity justifies a stay.

The district court issued a preliminary injunction after finding that the Agencies flagrantly violated a congressional command requiring warnings to States before mass terminations. Without providing notice to the States, the Agencies recently terminated over 24,000 probationary employees through unlawful reductions in force ("RIFs"). States were left to handle an unanticipated spike in unemployment insurance claims and increased demand for public services—the very harms that advance warning is intended to ameliorate. Recognizing that the Agencies' conduct was forbidden by clear statutory and regulatory text, the district court maintained the status quo ante by preliminarily enjoining the Agencies from continuing their string of unlawful mass firings and reinstating the terminated employees.

The Agencies fail to satisfy any of the criteria for the extraordinary relief they seek. When federal agencies engage in mass terminations, they must follow statutorily prescribed RIF procedures, including giving States notice that enables them to deploy federally mandated support services to help employees locate new jobs *before* they are unemployed. Here, the Agencies abruptly terminated thousands of employees without warning, resulting in significant irreparable injury. Those injuries, combined with the lack of legally required notice, give the States standing

to sue. And the violation of the States' clear statutory right is subject to judicial review. The Agencies' contrary contention—that States lack any recourse—is a novel assertion that contravenes basic Article III principles.

Further, the balance of the equities and the public interest cut firmly against a stay. There is no public interest in unlawful government action. Nor should the States have to shoulder the administrative burden of locating, supporting, and processing unemployment benefits claims made by thousands of unlawfully terminated employees while the Agencies gut the federal workforce without following the requisite procedures. Moreover, with the probationary employees now reinstated for nearly three weeks, the parties have returned to their last uncontested status, which a stay would disrupt. A stay is especially unwarranted here, where the injunction covers only the Appellee States and still permits for-cause terminations and lawfully executed RIFs. The motion for a stay should be denied.

## STATEMENT OF THE CASE

### Legal Framework

#### Termination of Probationary Employees

New employees and certain employees who have changed offices or received promotions are subject to probationary periods. 5 U.S.C. § 7511(a)(1); 5 C.F.R. § 315.801. An agency may terminate a probationary employee for one of three

reasons: (1) for conditions arising prior to employment, 5 C.F.R. § 315.805; (2) for cause, *id.* § 315.804(a); or (3) in accordance with a RIF, 5 U.S.C. § 3502.

Regarding for-cause terminations, Office of Personnel Management ("OPM") regulations direct agencies to use the probationary period "to determine the fitness of the employee" and permit termination "if the employee fails to demonstrate fully his or her qualifications," 5 C.F.R. § 3l5.803(a), meaning that the employee displays "inadequacies [in] his performance or conduct," *id.* § 315.804(a). For-cause terminations require the agency to "honestly be dissatisfied with the probationer's conduct or performance after giving him a fair trial on the job." *McGuffin v. SSA*, 942 F.3d 1099, 1102 (Fed. Cir. 2019) (internal quotation marks omitted). The agency must also notify the employee in writing "as to why he is being separated" for inadequate performance or conduct. 5 C.F.R. § 315.804(a).

By contrast, a RIF occurs when an agency separates employees "because of lack of work; shortage of funds; [and/or] reorganization." *Id.* § 351.201(a)(2). A reorganization "means the planned elimination, addition, or redistribution of functions or duties in an organization." *Id.* § 351.203. Agencies wishing to separate employees under these circumstances "shall" follow RIF regulations. *Id.* § 351.201(a)(2).

RIFs require a lengthy process, with preparations taking upwards of 12 to 18 months. (ECF 4-37, DiMartini Decl. ¶ 18.) Among other requirements, agencies

must establish "competitive areas" within which "employees compete for retention," 5 C.F.R. § 351.402(a); compile a retention register of employees in each competitive level, *id.* §§ 351.403-351.404; and rank employees for retention based on their tenure group, length of service, veteran preference, and performance, 5 U.S.C. § 3502(a); 5 C.F.R. §§ 351.501-351.504.  These regulations extend to probationary employees and grant them some retention preferences.  5 C.F.R. §§ 351.202(a)-(b), 351.501(b), 351.502(b).

### RIF Notices to States

When a RIF will result in the termination of "50 or more employees in a competitive area," an agency must "provide written notification of the action" 60 days in advance to the "State or the entity designated by the State to carry out rapid response activities under title I of the Workforce Investment Act of 1998." 5 C.F.R. § 351.803(b);    5 U.S.C. § 3502(d)(3)(A), (d)(1)(B), (e);    5 C.F.R. § 351.801(b).  Absent notice, "an employee may not be released[] due to a reduction in force." 5 U.S.C. § 3502(d)(1).

### States' Rapid Response Obligations

Under the Workforce Investment Act and the Workforce Innovation and Opportunity Act of 2014,[1] states must carry out "rapid response activities" to assist

---

[1] Rapid response duties imposed on States under § 134(a)(2)(A) of the Workforce Investment Act—referenced in 5 U.S.C. § 3502(d)(3)(A)(i)—still apply

dislocated workers in obtaining reemployment when there is a "mass layoff" causing a "substantial increase[] in the number of unemployed individuals." 29 U.S.C. § 2864(a)(2)(A)(i)(II); *id.* § 3174(a)(2)(A)(i)(II). The purpose of the rapid response system is to cushion the blow of sudden mass layoffs by helping employees quickly find new work.

The States provide rapid response services to those terminated as part of RIFs. (*See, e.g.*, ECF 4-5, Maryland Labor Decl. ¶ 14.) These services include "onsite contact with employers and employee representatives," "employment and training" activities, and "assistance to the local community in developing a coordinated response and in obtaining access to State economic development." 29 U.S.C. § 3102(51). Advance notice helps States support workers in finding new employment—ideally before the RIF takes effect.

**Factual Background**

**The Agencies' Mass Terminations Without Notice**

The current Administration aims "to dramatically reduce the size of the federal workforce." (ECF 78-4, CHCO Email, at 4.) Consistent with that goal, on January 20, Acting OPM Director Charles Ezell directed agency heads to "identify all employees on probationary periods," "send a report to OPM listing all such

_____

under § 134(a)(2)(A) of the Workforce Innovation and Opportunity Act. *Compare* 29 U.S.C. § 2864(a)(2)(A), *with* 29 U.S.C. § 3174(a)(2)(A).

employees," and "promptly determine whether those employees should be retained." Mem. from Charles Ezell to Heads & Acting Heads of Dep'ts & Agencies 1 (Jan. 20, 2025), tinyurl.com/y4cjp5wh.

On February 13, OPM ordered the mass termination of probationary employees. Chris Megerian & Michelle L. Price, *Trump Administration Begins Sweeping Layoffs with Probationary Workers, Warns of Larger Cuts to Come*, Associated Press (Feb. 13, 2025), tinyurl.com/mtzwfc6j. OPM reiterated that demand a day later and drafted a template termination letter for the Agencies to send to their probationary employees, informing the employees that their removal was "based on [their] performance." (ECF 78-4, CHCO Email, at 4.) The Agencies obeyed, firing over 24,000 probationary employees as of the filing of the complaint. (ECF 1, Compl. ¶¶ 102-40.) Each termination occurred without notice to the States.

In carrying out the terminations, the Agencies largely relied on OPM's template language, which stated that the employees were being terminated because their "ability, knowledge and skills do not fit the Agency's current needs, and [their] performance has not been adequate to justify further employment." (ECF 33-2, Redacted Decl. ¶ 5; DiMartini Decl. ¶ 13.)

These terminations were not based on individualized findings regarding the employees' performance. As a former OPM Director explained, it is "not possible . . . for so many federal agencies to have independently and simultaneously

decided to terminate large numbers of their workers," or "to have done proper assessments of all these employees." (ECF 78-9, Archuleta Decl. ¶¶ 12-13; DiMartini Decl. ¶ 14 (similar).)[2] At least one agency's leadership disclosed that it "did not review or consider the actual job performance or conduct" for any terminated probationary employee. (DiMartini Decl. ¶ 14; ECF 4-36, Grant Decl. ¶ 19.) Some termination letters even stated that the employee was being terminated "per OPM instructions." (ECF 78-10, Schwarz Decl. ¶ 10.) In response to unemployment claims, several agencies represented that the terminations were due to a "reduction in force" or a "permanent lack of work due to a change in Presidential Administration." (Maryland Labor Decl. ¶¶ 61-62.) One agency's termination email even instructed employees to "direct [their] inquiries to rif@gsa.gov." (ECF No. 78-12, GSA Email, at 2.)

### Spikes in Unemployment and Demand for Public Services

In the wake of these mass terminations, many States have seen significant increases in the number of unemployment claims filed by former federal employees. (*See, e.g.*, Maryland Labor Decl. ¶¶ 18, 50, 52 (30-60 claims *per day*, 330% increase); ECF 4-11, New Jersey Labor Decl. ¶¶ 14-15 (273%); ECF 4-7, California

---

[2] Many employees purportedly terminated for performance had recently received stellar reviews. (*See, e.g.*, ECF 33-11, Redacted Decl. ¶ 11 ("Outstanding"); ECF 33-12, Redacted Decl. ¶ 12 ("Exceeds Expectations").)

Employment Decl. ¶ 30 (149%); ECF 4-8, Illinois Employment Decl. ¶¶ 15-16 (almost the same number of claims filed in the last several weeks as in all of 2024).) To fulfill their rapid response duties, and because they received no notice of these terminations, the States devoted significant resources to affirmatively contact the Agencies, monitor public reporting, and conduct mass outreach to identify impacted workers. (*See, e.g.*, Maryland Labor Decl. ¶¶ 16, 19-23; ECF 4-11, New Jersey Labor Decl. ¶¶ 16-18.) Some diverted staff from pressing projects to retrain them to provide rapid response services. (*See, e.g.*, Maryland Labor Decl. ¶¶ 24-28.) Others created new websites or set up dedicated phone lines to find and assist terminated federal employees. (*See, e.g.*, Maryland Labor Decl. ¶ 29; ECF 4-8, Illinois Employment Decl. ¶ 32; ECF 4-7, California Employment Decl. ¶ 19.) The States still do not know exactly how many probationary employees were terminated in each geographic area, or by what agency those employees were terminated.

### Procedural History

On March 6, 2025, the States filed suit to challenge the mass termination of probationary employees without following RIF procedures. The next day, the States requested that the district court temporarily restrain further unlawful terminations of probationary employees, reinstate probationary employees unlawfully terminated, and that the Agencies provide information to the States and district court in regular status reports. (ECF 4-1, at 3-4.) The district court subsequently granted the States'

motion for a temporary restraining order ("TRO") on a nationwide basis as to all but three defendants.[3]

The Agencies requested a stay of the TRO in this Court, which was denied. That same day, they filed a status report stating that they rescinded many of the terminations and acknowledging that almost all the terminations were not due to performance. (*See, e.g.*, ECF 52-1, at 14 (explaining that Department of Homeland Security's report of 313 probationary employee terminations "excludes [those] terminated in individualized actions based on their performance"); ECF 52-1, at 18 n.1 (similar); ECF 52-1, at 44 (similar).)

On April 1, the district court granted the States' motion for a preliminary injunction with respect to all but one defendant. It narrowed the relief to apply "only with respect to employees who live or work in Plaintiff States." (ECF 125, at 70.) The injunction does not prevent the Agencies from terminating employees for individualized cause or from conducting future RIFs, provided that they follow lawful procedures. (ECF 126, at ¶ 3.) The district court denied the Agencies' subsequent motion for a stay (ECF 134), and the Agencies filed an appeal and again seek a stay from this Court.

---

[3] The district court excluded the Department of Defense, the National Archives and Records Administration, and OPM from the TRO without prejudice. (ECF 43, at 39.)

**ARGUMENT**

A stay pending appeal is "an exercise of judicial discretion," and "not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (internal quotation marks omitted). The moving party bears a "heavy burden" of demonstrating entitlement to this "extraordinary" remedy. *Winston-Salem/Forsyth Cnty. Bd. of Educ. v. Scott*, 404 U.S. 1221, 1231 (1971). A court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (internal quotation marks omitted). These factors overwhelmingly disfavor a stay.

**I.    THE AGENCIES ARE NOT LIKELY TO PREVAIL ON THE MERITS.**

**A.    The Agencies Conducted Unlawful RIFs Requiring Notice.**

Federal agencies may terminate probationary employees for one of three reasons: (1) conditions arising before their employment, 5 C.F.R. § 315.805; (2) unsatisfactory performance or conduct during employment, *id.* § 315.804(a); or (3) a broader RIF based on a general "lack of work; shortage of funds; [and/or] reorganization," *id.* § 351.201(a)(2); 5 U.S.C. § 3502. Here, the Agencies terminated their probationary employees through a series of massive RIFs but ignored the

relevant legal requirements.  As the district court explained, new evidence since the TRO strengthens the "conclusion that RIFs occurred."   (ECF 125, at 42); *see* discussion at page 13 below (last three bullet points).  Because the Agencies did not provide the requisite notice, these RIFs were unlawful and cannot stand.  The Agencies have not made a strong showing to the contrary.

The Agencies contend that the Court is required to treat the mass terminations as if they were based on performance simply because most termination letters say that the employees were fired for cause.  Mot. 24.  But courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Department of Commerce v. New York*, 588 U.S. 752, 785 (2019) (internal quotation marks omitted).  Here, the Agencies' contention that they evaluated performance is overwhelmingly refuted by the evidence, including:

- OPM's directive to terminate, not evaluate, probationary employees (DiMartini Decl. ¶ 5);

- Declarations of agency officials stating that individual assessments were *not* undertaken (Grant Decl. ¶ 19; DiMartini Decl. ¶ 16);

- Employee declarations documenting exemplary evaluations shortly before termination, *see* note 2 above;

- The Agencies' admission that many employees were terminated due to a "reduction in force" (Maryland Labor Decl. ¶ 62);

- "The sheer number of employees that were terminated in a matter of days,"—more than 24,000—the district court determined, "belies any

argument that these terminations were due to the employees' individual unsatisfactory performance or conduct" (ECF 43, at 33);

- The Agencies' declarations confirming that hundreds of employees were not "terminated in individualized actions based on their performance" (ECF 52-1 at 14, 18 & n.1, 44);

- Termination letters that expressly stated that firings were pursuant to applicable "civil service RIF regulations" (ECF 78-10, Schwartz Decl. at ¶ 17); and

- Agency communications instructing terminated employees to "direct [their] inquiries to rif@gsa.gov," (ECF 78-12, GSA Email, at 2).

To terminate probationary employees for unsatisfactory performance, employers "must *honestly* be dissatisfied with the probationer's conduct or performance after giving him a fair trial on the job." *McGuffin*, 942 F.3d at 1102 (emphasis added) (internal quotation marks omitted). That is plainly not what happened here. The Agencies cannot rely on the procedures governing for-cause terminations when those terminations were not undertaken for cause.

Instead, the Agencies were required to follow RIF procedures under binding OPM regulations. RIF procedures *must* be used when an agency separates an employee due to "lack of work," "shortage of funds," or "reorganization," among other things. 5 C.F.R. § 351.201(a)(2). As the district court recognized, the Agencies' "own briefing . . . indicates that these terminations were RIFs," undertaken for exactly those reasons. (ECF 125 at 47; *see* ECF 101, at 20-21.) Moreover, in responses to unemployment reports, some Agencies explained that

terminations were effectuated due to a "reduction in force" or because of "permanent lack of work." (Maryland Labor Decl. ¶¶ 61-62.) And the Administration has publicly explained its own actions by opining that "[t]here are too many federal employees" and salaries "contribute[] significantly to federal spending and debt." *See* The White House, *Fact Sheet: President Donald J. Trump Works to Remake America's Federal Workforce* (Feb. 11, 2025), tinyurl.com/3tfbpxwc. The federal government may be entitled to terminate some employees for these reasons, but it must still follow RIF procedures.

The Agencies counter that, because they did not *label* the terminations as RIFs, and because they did not take even the most preliminary steps toward complying with the applicable statutes and regulations (for example, by eliminating the relevant *positions* rather than merely firing employees), the terminations were somehow not RIFs. Mot. 25. As the district court correctly recognized, that "has it backwards." (ECF 125, at 48.) The existence of a RIF turns not on whether the Agencies complied with statutorily mandated procedures, but rather on whether they conducted mass terminations due to a lack of work, a shortage of funds, or part of a reorganization—"regardless of what label the [Agencies] attach[] to the actions." (ECF 125, at 48.) To conclude otherwise would reward the Agencies for their noncompliance, or worse yet, for intentionally flouting the law.

As the district court concluded, "these were indeed RIFs." (ECF 125, at 49.) And the Agencies have never disputed that they are required to provide advance notice to states to conduct such RIFs. *See* Mot. 5. Yet they failed to comply with these clear requirements. Because the Agencies' legal violations are clear and obvious, they have no likelihood of success on the merits. *See CASA, Inc. v. Trump*, No. 25-1153, 2025 WL 654902, at *1 (4th Cir. Feb. 28, 2025) (denying stay request for failure to make "strong showing" of likelihood of success given that "circuit precedent foreclose[d] the government's position").

### B.     The States Have Standing.

The district court correctly concluded that each State has Article III standing. To establish standing, a State must show "(i) that [it] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused . . . by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 380 (2024). Here, the States asserted a direct injury based on the Agencies' failure to provide advance notice under the RIF statutes and regulations. The Agencies' claim to the contrary does not come close to the "strong showing" needed to grant a stay. *See Nken*, 556 U.S. at 434.

The States' injury is an informational one that has caused specific concrete harms. Under black-letter law, an informational injury can constitute an injury in fact when there is a "lack [of] access to information to which [one] is legally entitled"

and "the denial of that information creates a real harm with an adverse effect." *Dreher v. Experian Info. Solutions, Inc.*, 856 F.3d 337, 345 (4th Cir. 2017). Here, the record is replete with evidence supporting both of those requirements.

Congress granted the States the statutory right to certain information in advance of mass firings to avoid a predictable harm to states and localities. *See* 5 U.S.C. § 3502(d)(3). As a consequence of the lack of warning, the States have suffered specific harms, including (1) costs from the hasty rollout of rapid-response protocols; (2) burdens associated with processing unanticipated surges in unemployment claims; (3) sudden disruptions to state programs depending on federal workers; and (4) unexpected financial harms from decreased tax revenue and increased reliance on state social service programs. (ECF 125, at 9-16.) Contrary to the Agencies' assertion, Mot. 16-17, the States *still* lack information as to the unlawfully terminated employees. But even if that were not so, the Agencies miss the point: the States were not just entitled to information, but to advance *warning*, the absence of which caused irreparable harm.

Notwithstanding the States' clear entitlement to notice and the myriad harms caused by the unwarned terminations, the Agencies continue to claim that *United States v. Texas*, 599 U.S. 670 (2023), "squarely foreclose[s]" Article III standing. Mot. 14. Not so. *Texas* had nothing to do with informational injuries caused by noncompliance with a statute that entitled plaintiffs to notice. Instead, *Texas*

involved a state's challenge to the federal government's enforcement priorities regarding third parties. In that context, the state's follow-on harms from non-enforcement were indeed attenuated and peripheral. *See* Mot. 14. But invoking *Texas* here is attempting to "cram[] a square peg into a round hole." *In re Yahweh Ctr., Inc.*, 27 F.4th 960, 968 (4th Cir. 2022). The States have experienced a violation of a specific statutory right to advanced notice, resulting in concrete injuries. And those pocketbook harms and resource strains are *exactly* the sort of harms Congress meant to forestall by requiring warnings before mass terminations. They are anything but "peripheral." *Compare Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 170-71 (4th Cir. 2023) (recognizing Article III injury from the deprivation of information required to be disclosed by statute), *with TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021) (finding no standing where "[a]n asserted informational injury . . . causes no adverse effects" (internal quotation marks omitted)).

## C.     The States' Claims Are Not Subject to Administrative Channeling.

Contrary to the Agencies' contentions, neither the Federal Service Labor-Management Relations Statute nor the Civil Service Reform Act ("CSRA") precludes jurisdiction. *See* Mot. 18-23. The Agencies ask this Court to be the first in the country to endorse an extraordinary expansion of the implied channeling doctrine that would leave States with effectively no judicial review and no remedy *at all*. The Court should decline this invitation.

Any jurisdictional analysis must start with "the strong presumption in favor of judicial review" that can be overcome only by "clear and convincing indications that Congress meant to foreclose review." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 370 (2018) (internal quotation marks omitted); *cf. Axon Enter., Inc. v. FTC*, 598 U.S. 175, 207 (2023) (Gorsuch, J., concurring) (questioning courts' "authority to engage in this business of jurisdiction-stripping-by-implication"). This presumption has special force in the APA context. *See Sackett v. EPA*, 566 U.S. 120, 129 (2012).

To overcome this presumption, the Agencies must satisfy the two-step framework from *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). Under that framework, a court first asks "whether Congress's intent to preclude district-court jurisdiction is fairly discernible in the statutory scheme." *Bennett v. SEC*, 844 F.3d 174, 181 (4th Cir. 2016) (internal quotation marks omitted). It next asks "whether plaintiffs' claims are of the type Congress intended to be reviewed within this statutory structure," considering whether (1) "the statutory scheme foreclose[s] all meaningful judicial review," (2) "the extent to which the plaintiff's claims are wholly collateral to the statute's review provisions," and (3) "whether agency expertise could be brought to bear on the . . . questions presented." *Id.* (alterations in original) (internal quotation marks omitted). "[M]eaningful judicial review is the most important factor." *Id.* at 183 n.7.

Application of this framework confirms that the district court had jurisdiction. At step one, the CSRA's "text, structure, and purpose" do not display a "fairly discernible" intent to limit jurisdiction over the States' claims. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012). The CSRA's administrative tribunals—the Merit Systems Protection Board and the Federal Labor Relations Authority—are available only to employees, unions, and employers. 5 U.S.C. §§ 7103(a)(1)-(2), 7123, 7703. Yet *States* have clear statutory rights to notice, making it illogical to conclude that Congress intended CSRA preclusion to encompass suits like this one. *See Koretoff v. Vilsack*, 614 F.3d 532, 536 (D.C. Cir. 2010) (no preclusion where Congress did not foreclose "review to the class to which the plaintiff belongs" (alterations omitted) (internal quotation marks omitted)).

Even if this Court were to proceed to step two, the CSRA still would not preclude this suit. If the district court lacked jurisdiction, the States would be stripped of meaningful judicial review. And their claims about notice are "wholly collateral" to the CSRA's administrative review scheme, *Thunder Basin*, 510 U.S. at 212 (internal quotation marks omitted), because notice to States has "nothing to do with" the labor-related matters that the administrative tribunals "regularly adjudicate[]" between employees, unions, and employers, *Axon*, 598 U.S. at 193 (alteration in original) (internal quotation marks omitted). Lastly, the administrative tribunals specialize in individualized adjudications of prototypical employee

disputes and lack the expertise to handle the States' claims—*i.e.*, that the Agencies are indiscriminately targeting a swath of the federal workforce to gut the civil service without warning the States.

The Agencies' reliance on cases involving ordinary employment disputes between employees, unions, and employers is misguided. *See* Mot. 20-21. Unlike the plaintiff in *United States v. Fausto*, 484 U.S. 439 (1988), the States are not asserting garden-variety employment claims but, rather, are challenging the Agencies' failure to provide them with statutorily required notice, which is not "the type of personnel action covered by" the CSRA. *Id.* at 448. *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), is similarly inapposite. Predating *Thunder Basin*, *Block* concerned a statutory scheme that allowed milk producers and handlers to participate in the adoption of milk market orders, but "[n]owhere in the Act" permitted "participation by consumers." *Block*, 467 U.S. at 347. The Court concluded that consumers, having no statutory rights, could not seek judicial review. In contrast, Congress expressly conferred the right to notice to the States, and thus did not "intend[] to foreclose" their ability to vindicate that right. *Id.* Similarly, allowing the States' claims to move forward would not "leave a gaping hole in the CSRA." Mot. 23. The States have a clear statutory right yet are not encompassed in the CSRA's administrative-review scheme—making them differently situated from employees, unions, or run-of-the-mill third parties.

## II. THE EQUITABLE FACTORS DO NOT FAVOR A STAY.

Staying the preliminary injunction would "substantially injure" both the States, which are responsible for providing rapid response services, and "the other parties interested in the proceeding"—namely, the thousands of probationary employees. *See Nken*, 556 U.S. at 426. Those employees are now back with their agencies in accordance with the parties' last uncontested status. The district court's carefully crafted preliminary injunction properly maintains the status quo ante for a limited subset of probationary employees—those "[w]hose duty station . . . and/or residence is in one of" the States. (ECF 126, at 4.) Upending the injunction would cause significant disruption, reinstituting the same chaos that preceded the TRO and triggering a new wave of unemployment and benefits claims.

Maintaining the injunction is plainly in the public interest. *See Roe v. Department of Def.*, 947 F.3d 207, 230-31 (4th Cir. 2020). As the district court recognized, the Agencies' unwarned mass terminations caused "temporal and immediate" damage (ECF 125, at 64) tied to the States' legal obligations to provide rapid response services and provide benefits to their residents (ECF 125, at 15-18). Indeed, each day that probationary employees are unemployed creates rising and likely unrecoverable costs for the States, including "substantial" "money damages" and the diversion of "resources and personnel to accommodate the shifting employment-response landscape." (ECF 125, at 63.) The Agencies' suggestion that

preliminary relief is unjustified because terminated employees "may obtain back pay," Mot. 27, ignores the nature of this suit. Back pay to employees alone would not redress injuries *to the States*. As the Agencies themselves repeatedly argued, "the only way the States could be made whole was by reinstatement." (ECF 125, at 65 (citing ECF 20, at 14, 17).)

For terminated probationary employees, the injuries that would result from a stay are profound now that the parties have largely returned to the status quo ante. It has been nearly three weeks since the Agencies first reinstated thousands of probationary employees—which the district court deemed "meaningful progress towards compliance with the TRO" (ECF 72, at 1)—and almost two weeks since the Agencies represented having "achieved substantial compliance" (ECF 103, at 3). A stay would disrupt this status quo ante and prompt another unanticipated round of mass terminations, once again leaving thousands of blameless public servants in the lurch. That is neither equitable nor in the public interest.

Any harm to the Agencies pales in comparison, especially considering the district court's tailored injunction. The Agencies identify only two purported harms. *First*, they contend that having to "continue employing individuals whose services [an agency] no longer requires" irreparably injures the government. Mot. 26. But reviving established employment relationships with employees who were only recently separated imposes relatively modest burdens. *See League of Women Voters*

*of N.C. v. North Carolina*, 769 F.3d 224, 248 (4th Cir. 2014) (finding burden on government to restore status quo was lessened because relevant "systems have existed, do exist, and simply need to be resurrected"). And having to employ individuals whose services are ostensibly no longer required for a brief period—generally 60 days to provide notice—is exactly what the RIF procedures require. That may be some constraint on the Agencies' "internal affairs," but it is hardly irreparable harm. Mot. 26. Indeed, the Agencies seemingly ignore that the district court permitted them to move forward with legitimate RIFs during the pendency of this case, so long as they follow the proper procedures and give the States statutorily required notice.

*Second*, the Agencies assert that "the government will never be able to recover the salaries that it is being ordered to continue paying." Mot. 26. But the Agencies ignore that they would have had to cover costs for such salaries if they had followed the requisite RIF procedures, by continuing to employ probationary employees through the 60-day notice period to the States. In any event, the district court tailored its preliminary injunction to cover only probationary employees who work or reside in the Plaintiff States. (ECF 126.) By contrast, the effect of a stay on the States would be massive. It would resurrect the harms that prompted this action, forcing the States to once again scramble to aid residents in finding new jobs or accessing public benefits.

## CONCLUSION

The motion for a stay should be denied.

Respectfully submitted,

KEITH ELLISON
Attorney General of Minnesota

LIZ KRAMER
Solicitor General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
(651) 757-1059
(651) 282-5832 (facsimile)
liz.kramer@ag.state.mn.us

Attorneys for the State of Minnesota


BRIAN SCHWALB
Attorney General of the District of
Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

ANNE DENG
TESSA GELLERSON
CHRIS EDWARD MENDEZ
MARK A. RUCCI
Assistant Attorneys General
Office of the Attorney General for
the District of Columbia
400 6th Street N.W., 10th Floor
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

Attorneys for the District of Columbia

ANTHONY G. BROWN
Attorney General of Maryland

JULIA DOYLE
Solicitor General

/s/ Virginia A. Williamson
ADAM KIRSCHNER
MICHAEL DREZNER
VIRGINIA A. WILLIAMSON
Assistant Attorneys General
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6584
(410) 576-6437 (facsimile)
vwilliamson@oag.state.md.us

Attorneys for the State of Maryland


KRISTIN K. MAYES
Attorney General of Arizona

HAYLEIGH S. CRAWFORD
Deputy Solicitor General
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Hayleigh.Crawford@azag.gov
ACL@azag.gov

Attorneys for the State of Arizona

ROB BONTA
Attorney General of California

SATOSHI YANAI
Senior Assistant Attorney General
MIRANDA MAISON
Supervising Deputy Attorney General
DEMIAN CAMACHO
Deputy Attorney General
California Department of Justice
600 W. Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9132
Demian.Camacho@doj.ca.gov

Attorneys for the State of California


WILLIAM TONG
Attorney General of Connecticut

MICHAEL SKOLD
Solicitor General
165 Capitol Avenue
Hartford, Connecticut 06106
 (860) 808 5020
michael.skold@ct.gov

Attorneys for the State of Connecticut

PHIL WEISER
Attorney General of Colorado

DAVID MOSKOWITZ
Deputy Solicitor General
Office of the Colorado Attorney General
1300 Broadway, #10
Denver, Colorado 80203
(720) 508-6000
David.Moskowitz@coag.gov

Attorneys for the State of Colorado


KATHLEEN JENNINGS
Attorney General of Delaware

IAN R. LISTON
Director of Impact Litigation

VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, Delaware 19801
(302) 683-8899
vanessa.kassab@delaware.gov

Attorneys for the State of Delaware

ANNE E. LOPEZ
Attorney General of Hawai'i

KALIKO'ONĀLANI D. FERNANDES
Solicitor General
425 Queen Street
Honolulu, Hawai'i 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

Attorneys for the State of Hawai'i


ANDREA JOY CAMPBELL
Attorney General of Massachusetts

KATHERINE DIRKS
Chief State Trial Counsel
Office of the Attorney General
1 Ashburton Pl.
Boston, Massachusetts 02108
(617) 963-2277
katherine.dirks@mass.gov

Attorneys for the Commonwealth of
Massachusetts


AARON D. FORD
Attorney General of Nevada

HEIDI PARRY STERN
Solicitor General
Office of the Nevada Attorney
General
1 State of Nevada Way, Ste. 100
Las Vegas, Nevada 89119
HStern@ag.nv.gov

Attorneys for the State of Nevada

KWAME RAOUL
Attorney General of Illinois

JANE ELINOR NOTZ
Solicitor General

SARAH A. HUNGER
Deputy Solicitor General
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5202
sarah.hunger@ilag.gov

Attorneys for the State of Illinois


DANA NESSEL
Attorney General of Michigan

BRYAN DAVIS, JR.
DEBBIE TAYLOR
Assistant Attorneys General
Department of Attorney General
Labor Division
3030 W. Grand Blvd., Ste. 9-600
Detroit, Michigan 48202
davisb47@michigan.gov
taylord8@michigan.gov
(313) 456-2200

Attorneys for the State of Michigan

RAÚL TORREZ
Attorney General of New Mexico

ANJANA SAMANT
Deputy Counsel for Impact Litigation
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, New Mexico 87501
(505) 490-4060
asamant@nmdoj.gov

Attorneys for the State of New Mexico


DAN RAYFIELD
Attorney General of Oregon

STACY M. CHAFFIN
Senior Assistant Attorney General
1162 Court Street NE
Salem, Oregon 97301
Stacy.Chaffin@doj.oregon.gov

Attorneys for the State of Oregon


CHARITY R. CLARK
Attorney General of Vermont

JONATHAN T. ROSE
Solicitor General
109 State Street
Montpelier, Vermont 05609
(802) 828-3171
Jonathan.rose@vermont.gov

Attorneys for the State of Vermont

MATTHEW J. PLATKIN
Attorney General of New Jersey

NATHANIEL LEVY
Deputy Attorney General
25 Market Street
Trenton, New Jersey 08625
Phone: (862) 350-5800
Nathaniel.Levy@njoag.gov

Attorneys for the State of New Jersey


LETITIA JAMES
Attorney General of New York

MARK S. GRUBE
Senior Assistant Solicitor General
New York Office of the Attorney General
28 Liberty St.
New York, New York 10005
(212) 416-8028
mark.grube@ag.ny.gov

Attorneys for the State of New York


PETER F. NERONHA
Attorney General of Rhode Island

NATALYA A. BUCKLER
Assistant Attorney General
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400, Ext. 2022
nbuckler@riag.ri.gov

Attorneys for the State of Rhode Island

Joshua L. Kaul
Attorney General of Wisconsin

Brian P. Keenan
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
(608) 294-2907 (Fax)
keenanbp@doj.state.wi.us

Attorneys for the State of Wisconsin

**CERTIFICATE OF COMPLIANCE**

1.     This document complies with the type-volume limitations of Fed. R. App. P. 27(d)(2)(A) because the brief contains 5,129 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a 14-point proportionally spaced typeface, Times New Roman, using Microsoft Word.

/s/ *Virginia A. Williamson*
Virginia A. Williamson

## CERTIFICATE OF SERVICE

I certify that on this 7th day of April, 2025, the foregoing Opposition to Motion for Stay Pending Appeal was filed electronically and served on counsel of record who are registered CM/ECF users.


/s/ *Virginia A. Williamson*
Virginia A. Williamson